# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AETNA INC. and AETNA LIFE INSURANCE COMPANY, | : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | |
| THE PEOPLE'S CHOICE HOSPITAL, LLC, et al., | : : | No. 17-4354 |
| Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                     **March 13, 2018**

Aetna Inc. and Aetna Life Insurance Company (collectively, "Aetna") allege that Defendants engaged in a widespread $21 million health care billing fraud scheme. Specifically, Aetna claims that Defendants were part of a scheme that wrested control of Newman Memorial Hospital ("Newman"), a small hospital in rural Oklahoma. Defendants allegedly paid off doctors around the country to refer specimens for testing to various labs that were part of the scheme. Defendants would then submit false claims to Aetna, claiming that the tests were performed at Newman. According to Aetna, Defendants misrepresented the location where medical tests and services were performed because Aetna paid a higher contract rate for services performed at Newman than at the various locations where the tests and services were actually performed. Defendants than diverted the funds paid by Aetna.

Defendants have filed a number of motions to dismiss. Mission Toxicology, LLC, Mission Toxicology II, LLC, Mission Toxicology Management Company, LLC, Sun Clinical Laboratory, LLC, Sun Ancillary Management, LLC, Integrity Ancillary Management, LLC, Michael Murphy, and Jesse Saucedo, Jr. have filed a motion to dismiss, or in the alternative, to transfer venue under

28 U.S.C. § 1404(a). The People's Choice Hospital, LLC, PCH Management Newman, LLC, and PCH Lab Services, LLC filed a motion to dismiss or to transfer venue. Dr. Seth Guterman and David Wanger filed a motion to dismiss for lack of personal jurisdiction, or in the alternative, for failure to state a claim.[1]

Aetna has raised serious allegations of significant and far-reaching fraud. However, upon reviewing the record, the Court is convinced that this case should not be litigated in this District. Accordingly, the Court will transfer this matter to the Western District of Texas.

I.  **FACTUAL BACKGROUND**

   A.  **The Entities and Individuals in the Litigation**

Plaintiffs are Aetna, Inc., and Aetna Life Insurance Company. Aetna, Inc., through its affiliated companies, provides health insurance and administrative services throughout the United States. (Compl. ¶ 5.) Aetna Life Insurance Company is one of Aetna Inc.'s affiliates; it provides health insurance and administrative services throughout the United States. (*Id*. ¶ 6.) The People's Choice Hospital, LLC is located in Illinois. (*Id*. ¶ 7.) Seth Guterman is the sole member and manager of The People's Choice Hospital, LLC. (*Id*.) PCH Management Newman is an Oklahoma limited liability company. (*Id*. ¶ 8.) PCH Lab Services, LLC is an Illinois limited liability company. (*Id*. ¶ 9.) PCH Labs, Inc. is a Delaware corporation. (*Id*. ¶ 10.) Mission Toxicology, LLC, Mission Toxicology II, LLC, and Mission Technology Management Company, LLC, are all Texas limited

---

[1] The People's Choice Hospital, LLC, PCH Management Newman, LLC, PCH Lab Services, LLC, Dr. Guterman, and Wanger have also filed a motion to compel arbitration and to stay proceedings. The Court will address that motion in a separate Memorandum.

2

liability companies.[2] (*Id*. ¶¶ 11–13.) Sun Clinical Laboratory, LLC and Sun Ancillary Management, LLC, are also Texas limited liability companies.[3] (*Id*. ¶¶ 15–16.) Integrity Ancillary Management, LLC ("Integrity") is also a Texas limited liability company. (*Id*. ¶ 18.)

The individual Defendants are: (1) Dr. Seth Guterman, a citizen of Illinois; (2) David Wagner, an Arizona citizen and the interim CEO of Newman; (3) Dr. Michael Murphy, a Texas citizen and a principal for the Sun Defendants; and (4) Jesse Saucedo, Jr., a Texas student and the founding partner of Integrity and a principal of the Mission Defendants. (*Id*. ¶¶ 20–23.)

Newman is located in Shattuck, Oklahoma, a town with fewer than 2,000 residents. (*Id*. ¶ 60.) In 2000, Aetna U.S. Healthcare, Inc. contracted with Newman, making Newman a participating provider with Aetna. (*Id*. ¶ 55.) "Aetna remits payment to Newman when Aetna receives a claim form bearing Newman's name and billing information, which is only to be used for medical services provided by and at Newman for Aetna members who were Newman patients." (*Id*. ¶ 56.) Between 2013 and 2015, Aetna paid Newman Memorial Hospital an average of $91,000 annually. (*Id*. ¶ 60.) After Defendants entered the picture, Newman submitted approximately 834 lab claims per month—up from an average of six claims per month—totaling over $21 million in claims. (*Id*. ¶ 61.)

**B.     Aetna's Network**

Newman is an in-network provider, which means that it provides services to Aetna members pursuant to an agreement. (*Id*. ¶ 49.) Aetna agrees to issue payment, and the provider must accept the contracted rate negotiated between Aetna and the provider. (*Id*. ¶ 50.) Aetna is not necessarily contractually obligated to pay claims by out-of-network providers. (*Id*. ¶ 51.) Moreover, even if a

---

[2] The Court will refer to these three Defendants collectively as the "Mission Defendants."

[3] These two Defendants will be referred to collectively as the "Sun Defendants."

member's plan provides out-of-network benefits, such benefits are often limited, with the member required to pay for a larger share of the costs. (*Id*.) Non-participating providers are also subject to additional administrative reviews and scrutiny for appropriateness of the services and amounts they are charging members. (*Id*. ¶ 52.)

Aetna typically reimburses rural hospitals like Newman Memorial Hospital at a higher rate to ensure that Aetna members in rural America who may have minimal access to medical facilities are able to get care from professionals whose quality and credentials were vetted by Aetna. (*Id*. ¶ 59.)

### C. The Allegations

Aetna sums up the scheme as follows: In 2016, The People's Choice Hospital, PCH Management Newman, PCH Lab Services, and PCH Labs gained control of Newman with promises to help the financially struggling hospital. (*Id*. ¶¶ 31, 62.) Subsequently, these Defendants acquired complete control over the management, operations, and finances of Newman Memorial Hospital. (*Id*. ¶ 63.) Once they gained control, The People's Choice Hospital and PCH Management Newman entered into agreements with PCH Lab Services, PCH Labs, and the Lab Defendants[4] that defrauded Aetna. (*Id*. ¶¶ 32, 65.) According to the Complaint, certain Defendants paid and induced doctors throughout the country to send urine and blood specimens to the Lab Defendants. (*Id*. ¶ 33.) Under one such agreement, the Sun Defendants and the Mission Defendants received 70% of the monthly revenues not exceeding $4 million that Newman got from Aetna for lab-related services, and 60% of such revenues exceeding $4 million. (*Id*. ¶ 66.) The PCH Defendants also entered into a revenue-sharing agreement with Integrity. (*Id*. ¶ 67.) Dr. Murphy and Saucedo are the principals of and the

---

[4] "Lab Defendants" refers collectively to the Mission Defendants, the Sun Defendants, and Integrity.

Lab Defendants. (*Id.* ¶ 68.)

Defendants had these doctors inform the patients that their specimens would be sent to, tested, and processed by the Lab Defendants. (*Id.*) The specimens were sent to the Lab Defendants, but Defendants lied to Aetna by claiming that the specimens were sent to Newman, which had high reimbursement rates for lab services performed by and at Newman. (*Id.* ¶ 34.) Defendants took advantage of these higher rates by paying doctors to send specimens of Aetna members to the Lab Defendants, but misrepresenting that the specimens were sent to Newman Memorial Hospital in Oklahoma. (*Id.* ¶ 39.) PCH's President and Newman Memorial Hospital's interim CEO also lied to Aetna in letters and emails that insisted that Newman Memorial Hospital played a role in processing the specimens. (*Id.* ¶¶ 41–42, 130–37.) Defendants split up and distributed their ill-gotten gains. (*Id.* ¶ 36.) Indeed, "Defendants reaped millions of dollars in ill-gotten gains by repeating this process thousands of times at Newman and at other Aetna-affiliated facilities throughout the country." (*Id.* ¶ 37.)

Aetna has raised a number of claims against Defendants, alleging violations of RICO, fraud, negligent misrepresentation, unjust enrichment, civil conspiracy, and tortious interference.

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The moving party bears the burden of proving that venue is proper in the transferee district and that transfer is appropriate. *Lindley v. Caterpillar, Inc.*, 93 F. Supp. 2d 615, 617 (E.D. Pa. 2000); *see also Shutte v. ARMCO Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970). District

5

courts possess broad discretion in deciding motions to transfer venue, and they evaluate such motions on a case-by-case basis. *See Solomon v. Cont'l Am. Life Ins. Co.*, 472 F.2d 1043, 1045 (3d Cir. 1973); *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

**III.   DISCUSSION**

Courts in the Third Circuit apply a multi-factor test to determine whether transfer is appropriate, weighing private and public interests. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995). The private interests include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claims arose; (4) the convenience of the parties given their relative physical and financial condition; (5) the convenience of the witnesses to the extent they may be unavailable for trial in a given forum; and (6) the location of books and records to the extent they could not be produced in the alternative forum. *Id*. at 879. The public interests include: (1) the enforceability of the judgment; (2) practical considerations of trial logistics; (3) the relative court congestion of the two fora; (4) the local interests of each forum in deciding local controversies; (5) the public policies of the fora; and (6) the judges' relative familiarity with the applicable law. *Id*. at 879–80. The public factors focus on "practical considerations that could make the trial easy, expeditious, or inexpensive." *Id*. at 879.

**A.   Private Factors**

While "the plaintiff's choice of venue should not be lightly disturbed," *Jumara*, 55 F.3d at 879, it is entitled to less deference when the events giving rise to the lawsuit took place outside of the chosen forum. *See Cameli v. WNEP–16 The News Station*, 134 F. Supp. 2d 403, 405 (E.D. Pa. 2001). The most important factor for this Court's decision is where the claims arose. "When the vast

majority of the acts giving rise to plaintiff's claims take place in another forum, that weighs heavily in favor of transfer." *Hamilton v. Nochmison*, Civ. A. No. 09-2196, 2009 WL 2195138, at *3 (E.D. Pa. July 21, 2009). Although Aetna alleges a nationwide scheme, its allegations make clear that a small amount of the alleged scheme occurred in this District. The central scheme underlying Aetna's claims has a relatively small connection to this District. Newman, which Defendants allegedly used as a conduit for fraud, is located in Oklahoma. The Lab Defendants, major players in this scheme, performed their work in the Western District of Texas. Moreover, individual Defendants Murphy and Saucedo are both citizens of Texas. None of the remaining individual Defendants are Pennsylvania citizens. The only reason that Aetna posits for litigating this case in the Eastern District of Pennsylvania is that certain patients were seen by doctors in this District before their specimens were sent to the Lab Defendants. But this is a billing scheme, in which Aetna alleges that work Defendants stated was performed in Oklahoma was actually performed in Texas so that Defendants with little connection to this District could line their pockets by claiming higher reimbursement rates from Aetna. The central focus on the scheme is not where some doctors took specimens from patients, and it is far from the Eastern District of Pennsylvania.

The remaining factors appear neutral from the record before the Court. At this early stage of the litigation, the Court does not have concrete evidence that there will be witnesses unavailable for trial in this District. The record does not contain any information about the financial status of the parties—notwithstanding the possibility that Defendants have swindled millions of dollars from Aetna—but there is no evidence that Aetna will be disadvantaged proceeding in the Western District of Texas.

### B. Public Factors

The public factors in this case are neutral. A judgment in either venue will be enforceable. Court congestion and public policy are not at issue. Furthermore, Aetna brings its claims under a federal statute, and therefore judges in both districts should be familiar with the applicable law. Of course, Aetna has also raised a number of state law claims. The parties have yet to address any choice of law issues, but it is not clear why Pennsylvania law should apply to the merits of those state law claims. Accordingly, the Court cannot say that there is a local interest in the Eastern District of Pennsylvania deciding this controversy.

## IV. CONCLUSION

Plaintiffs raise serious and disturbing allegations. The Court believes, however, that they are best adjudicated in the Western District of Texas. Accordingly, the motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is granted. An Order consisted with this Memorandum will be docketed separately.