# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AETNA INC. and AETNA LIFE INSURANCE COMPANY, Plaintiffs, | : : : : | CIVIL ACTION |
| v. | : : | |
| THE PEOPLE'S CHOICE HOSPITAL, LLC, et al., Defendants. | : : : | No. 17-4354 |

**MEMORANDUM**

**Schiller, J.**  **March 13, 2018**

Aetna Inc. and Aetna Life Insurance Company (collectively, "Aetna") allege that a number of entities and individuals, including the Defendants who have filed the motion before the Court, engaged in a widespread $21 million health care billing fraud scheme. Specifically, Aetna claims that some of the Defendants took over the management of Newman Memorial Hospital ("Newman"), a small hospital in rural Oklahoma, and subsequently concocted a scheme to steal $21 million. Defendants allegedly paid off doctors around the country to refer specimens for testing to various labs that were part of the scheme. Defendants would then submit false claims to Aetna, representing that the tests were performed at Newman. According to Aetna, Defendants misrepresented the location where medical tests and services were performed because Aetna paid a higher contract rate for services performed at Newman than at the various locations where the tests and services were actually performed. Defendants than diverted the funds paid by Aetna away from Newman.

A number of the entities and individuals implicated in the fraud, specifically The People's Choice Hospital, LLC, PCH Management Newman, LLC, PCH Lab Services, LLC, Dr. Seth Guterman, and David Wanger (collectively, "PCH Defendants"), have moved to compel arbitration

and to stay proceedings. PCH Defendants charge that Aetna had previously agreed to arbitrate certain claims with Newman. According to the PCH Defendants, although they had not signed any arbitration agreement with Aetna, Aetna is nonetheless obligated to arbitrate its claims. Because the Court concludes that there is no basis to compel Aetna to arbitrate its claims against the PCH Defendants, the motion is denied.

I. **FACTUAL BACKGROUND**

There are a number of actors in this play, so the Court will introduce the cast, including defendants who play no role in this motion. Aetna Inc., through its affiliated companies, provides health insurance and administrative services throughout the United States. (Compl. ¶ 5.) Aetna Life Insurance Company is one of Aetna Inc.'s affiliates; it provides health insurance and administrative services throughout the United States. (*Id*. ¶ 6.) The People's Choice Hospital is located in Illinois. (*Id*. ¶ 7.) PCH Management Newman, LLC is an Oklahoma limited liability company. (*Id*. ¶ 8.) PCH Lab Services, LLC is an Illinois limited liability company. (*Id*. ¶ 9.) PCH Labs, Inc. is a Delaware corporation. (*Id*. ¶ 10.) Mission Toxicology, LLC, Mission Toxicology II, LLC, and Mission Technology Management Company, LLC, are all Texas limited liability companies.[1] (*Id*. ¶¶ 11–13.) Sun Clinical Laboratory, LLC and Sun Ancillary Management, LLC,[2] are also Texas limited liability companies, as is Integrity Ancillary Management ("Integrity"). (*Id*. ¶¶ 15–16, 18.)

The individual Defendants are: (1) Dr. Seth Guterman, a citizen of Illinois, and the sole member and manager of The People's Choice Hospital; (2) David Wagner, an Arizona citizen and

---

[1] The Court will refer to these three Defendants collectively as the "Mission Defendants."

[2] These two Defendants will be referred to collectively as the "Sun Defendants."

the interim CEO of Newman; (3) Dr. Michael Murphy, a Texas citizen and a principal of the Sun Defendants and Integrity; and (4) Jesse Saucedo, Jr., a Texas citizen and the founding partner of Integrity Ancillary Management and a principal of the Mission Defendants. (*Id*. ¶¶ 7, 20–23.)

And then there is Newman. Newman is located in Shattuck, Oklahoma, a town with fewer than 2,000 residents. (*Id*. ¶ 60.) In 2000, Aetna U.S. Healthcare, Inc. contracted with Newman, making Newman a participating provider with Aetna and all of Aetna's affiliated companies. (*Id*. ¶ 55.) Under the contract, "Aetna remits payment to Newman when Aetna receives a claim form bearing Newman's name and billing information, which is only to be used for medical services provided by and at Newman for Aetna members who were Newman patients." (*Id*. ¶ 56.) Aetna typically reimbursed rural hospitals like Newman at a higher rate to ensure that Aetna members in rural areas with fewer medical facilities were able to receive quality medical care from medical professionals whose quality and credentials were vetted by Aetna. (*Id*. ¶ 59.) Between 2013 and 2015, Aetna paid Newman an average of $91,000 annually. (*Id*. ¶ 60.)

Aetna and Newman renewed that agreement in 2016. The agreement included an arbitration provision, which required that "[a]ny controversy or claim arising out of or relating to this Agreement including breach, termination, or validity of this Agreement, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration." (PCH Defs.' Mot. to Compel Arb. and Stay Proceedings Ex. A [2016 Agreement] § 8.3.)

Unlike with in-network providers such as Newman, Aetna was not always contractually obligated to pay claims by out-of-network providers, such as the Sun Defendants and the Mission Defendants. (Compl. ¶ 51.) Moreover, even if a member's plan provided out-of-network benefits,

3

such benefits were often limited, with the member required to pay for a larger share of the costs. (*Id*.) Non-participating providers were also subject to additional administrative review and scrutiny for appropriateness of the services and amounts they were charging members. (*Id*. ¶ 52.)

In 2016, The People's Choice Hospital, along with PCH Management, promised to save the financially-struggling Newman if Newman would cede management control. (*Id*. ¶ 62.) Subsequently, The People's Choice Hospital, PCH Management Newman, PCH Lab Services, and PCH Labs acquired complete control over the management, operations, and finances of Newman. (*Id*. ¶ 63.) Under the direction of The People's Choice Hospital, Newman proceeded to enter into agreements with the Sun Defendants, Mission Defendants, and Integrity. (*Id*. ¶ 65.) Under one such agreement, the Sun Defendants and the Mission Defendants received 70% of the monthly revenues not exceeding $4 million that Newman got from Aetna for lab-related services, and 60% of such revenues exceeding $4 million. (*Id*. ¶ 66.) The People's Choice Hospital, PCH Management, PCH Lab Services, and PCH Labs also entered into a revenue-sharing agreement with Integrity. (*Id*. ¶ 67.) Dr. Murphy and Saucedo are the principals of the Sun Defendants, Mission Defendants, and Integrity. (*Id*. ¶ 68.)

Aetna sums up the scheme as follows: The People's Choice Hospital, PCH Management, PCH Lab Services, and PCH Labs gained control of Newman with promises to help the financially struggling hospital. (*Id*. ¶ 31.) Once they gained control, The People's Choice Hospital and PCH Management Newman entered into agreements with PCH Lab Services, PCH Labs, the Mission Defendants, the Sun Defendants, the individual Defendants, and Integrity, to defraud Aetna. (*Id*. ¶ 32.) According to the Complaint, certain Defendants paid and induced doctors throughout the country to send urine and blood specimens to the Sun Defendants, Mission Defendants, and Integrity.

(*Id*. ¶ 33.) Defendants had these doctors inform the patients that their specimens would be sent to, tested, and processed by these Defendants. (*Id*.) PCH's President and Newman's interim CEO also lied to Aetna in letters and emails that insisted that Newman played a role in processing the specimens. (*Id*. ¶¶ 41–42, 130–37.) The specimens were sent to the Sun Defendants, Mission Defendants, and Integrity, but Defendants lied to Aetna by claiming that the specimens were sent to Newman, which had higher reimbursement rates for lab services performed by and at Newman Memorial. (*Id*. ¶ 34.) Defendants then split up their ill-gotten gains. (*Id*. ¶¶ 37, 44.) Indeed, "Defendants reaped millions of dollars in ill-gotten gains by repeating this process thousands of times at Newman and at other Aetna-affiliated facilities throughout the country." (*Id*. ¶ 37.) In total, Aetna remitted over $21 million to Newman. (*Id*. ¶ 43.)

Aetna's Complaint has raised a number of claims, alleging violations of RICO, fraud, negligent misrepresentation, unjust enrichment, civil conspiracy, and tortious interference. The question now before the Court is whether Aetna must arbitrate its claims against the PCH Defendants.

## II. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id*. § 4. Before ordering parties to arbitrate, the Court must decide whether the parties

5

entered into a valid agreement to arbitrate. *See Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 264 (3d Cir. 2003); *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997).

"[W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). However, if the complaint and its supporting documents are unclear about the agreement to arbitrate, or if the party seeking to avoid arbitration has put forth additional facts sufficient to place the agreement to arbitrate in issue, "the motion to compel arbitration must be denied pending further development of the factual record." *Id*. at 774. Following this limited discovery on the question of arbitrability, the court may entertain a renewed motion to compel arbitration. *Id*. This renewed motion to compel must be reviewed using a summary judgment standard. *Id*. Under this standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking to compel arbitration bears the initial burden of showing that the non-movant has failed to establish one or more essential elements of its case. If it meets this burden, the party seeking to avoid arbitration must point to specific facts in the record that demonstrate that there is a genuine issue for trial. *Guidotti*, 716 F.3d at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986)).

### III.　DISCUSSION

The PCH Defendants seek to stay these proceedings and to compel Aetna to arbitrate its

claims. Without question, PCH Defendants did not sign the agreement between Aetna and Newman that they now seek to enforce. Rather, PCH Defendants rely on both an agency theory and an estoppel theory in an effort to force Aetna to arbitrate here. Neither of these theories requires Aetna to arbitrate its claims.

A court must make a two-step inquiry when faced with a motion to compel arbitration: (1) does a valid agreement to arbitrate exist; and (2) does the particular dispute fall within the scope of that agreement. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). Generally, there is a presumption that a particular dispute falls within the scope of an arbitration agreement. *Marciano v. MONY Life Ins. Co.*, 470 F. Supp. 2d 518, 525 (E.D. Pa. 2007). There is, however, no policy that favors the existence of a valid agreement to arbitrate. *Id.* at 526. Moreover, any presumption is favor of arbitrability does not apply to non-signatories to an agreement; "it applies only when both parties have consented to and are bound by the arbitration clause." *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014). This legal principle follows from the accepted legal principle that, "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). A non-signatory may be bound to an arbitration agreement, however, if "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). "There are five theories for binding a nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *Trippe*, 401 F.3d at 532.

The PCH Defendants raise the agency and estoppel theories. Before the Court turns to agency and estoppel, however, a threshold matter should be addressed. Aetna claims that it "issued payments

7

to Newman at the reimbursement rates it had negotiated with Newman that are part of the 2001 contract." (Pls.' Resp. to PCH's Mot. to Compel Arb. at 4.) Aetna claims that this 2001 contract is an "entirely different contract than the one PCH improperly relies upon in its motion, which is an agreement Aetna negotiated with Newman in 2016 relating to physician services." (*Id*. at 4 n. 4.)

This is puzzling. PCH Defendants seek to force Aetna to arbitrate based upon an agreement dated January 29, 2016, and between Newman, "on behalf of itself and any and all Group Providers, and all persons and entities that provide Covered Services billed under the Agreement . . . and Aetna Health Inc. . . . on behalf of itself and its Affiliates." (2016 Agreement.) Aetna, however, claims that "PCH is relying upon a completely inapplicable agreement" because the 2016 agreement applies only to physician services, not services provided by the hospitals, such as Newman. (Pls.' Resp. to PCH's Mot. to Compel Arb. at 2.)

Fortunately, this confusion is irrelevant. Even if the 2016 Agreement is a proper agreement upon which to turn to force arbitration upon Aetna, it is no help to the PCH Defendants.

### A. Agency

PCH Defendants argue that Aetna must arbitrate this litigation because they were agents of Newman. (Mem. of Law in Supp. of PCH Defs.' Mot. to Compel Arb. and Stay Proceedings at 4 ("The PCH Defendants acted as Newman's agent, so Aetna cannot evade its contractual agreement to arbitrate the disputes at issue here merely by suing the PCH Defendants instead of Newman.").) PCH Defendants note that a hospital management agreement between Newman and PCH Management Newman, LLC includes a paragraph that states that "[i]t is expressly understood that PCH is hereby retained by the Newman Entities to assist in the management of the Hospital, and that PCH is constituted the agent of the Newman Entities only for the purpose of carrying out its

8

obligations under this Agreement." (PCH Defs.' Mot. to Compel Arb. and Stay Proceedings Ex. B [Hosp. Management Agreement].) Thus, "the PCH Defendants indisputably acted as Newman's agents." (Mem. of Law in Supp. of PCH Defs.' Mot. to Compel Arb. and Stay Proceedings at 5.)

An agency relationship exists when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent. *AT & T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434 (3d Cir. 1994).

The PCH Defendants' argument is based on a reading of the Complaint that this is a simple breach of contract case in which Aetna disputes the PCH Defendants' right to bill for services not performed at Newman. It is far from clear based on the record, however, that the PCH Defendants were acting as the agents of Newman in this scheme. Regardless of the ultimate merits of Aetna's claims, it has not alleged the simple breach of contract claim that the PCH Defendants contend. Rather, Aetna asserts that Defendants engaged in widespread fraud. Aetna asserts that Newman is also a victim of this fraud in that Defendants ultimately used it as a conduit for fraud. Under Pennsylvania law, it is not clear that Newman would be responsible for the PCH Defendants' actions here. Proof of scienter on the part of the principal at the time of the misrepresentation is an essential element under Pennsylvania law to hold the principal liable for fraud and deceit practiced by his agent. *Miller v. Bare*, 457 F. Supp. 1359, 1366 (W.D. Pa. 1978). Under Pennsylvania law, which is the law to which both sides primarily cite, a principal is not liable for an agent's false representations if he has not authorized nor participated in them nor knowingly permitted the agent to make them. *Id*.

There is no such proof of control exercised by Newman over the PCH Defendants here, which puts into question whether there was an agency relationship that the PCH Defendants could

take advantage of here. Indeed, it looks as though Newman lacked control in this situation, with the Defendants pulling the stings of an unsuspecting fraud victim. It would be fundamentally unfair to permit PCH Management Newman to use an agreement it signed with one of the victims of its fraud as a cudgel to prevent another victim of that fraud from seeking redress through the courts.

The Court also rejects the PCH Defendants' attempt to sweep every actor and action at issue here into forced arbitration because Aetna and Newman agreed to arbitrate certain matters in a contract that may have no applicability here. PCH Management Newman agreed that for purposes of a hospital management agreement, it was an agent of Newman. Now, based on that narrow clause in a contract between Aetna and Newman, PCH Management Newman seeks to force an arbitration between itself; The People's Choice Hospital, LLC; PCH Lab Services, LLC; Dr. Seth Guterman; David Wanger; and Aetna. Thus, the PCH Defendants seek an arbitration that would leave out the only entity that signed both contracts, yet would include a number of entities not party to either agreement. Those same Defendants—who did not sign the agreement that includes an arbitration provision—now seek to force Aetna to arbitrate fraud claims that seem far afield from the scope of the agreement between Newman and Aetna. The Court sees no legal basis upon which to force Aetna to arbitrate with entities with whom it never agreed to arbitrate.

**B.    Estoppel**

Under an equitable estoppel theory, a non-signatory to an arbitration agreement can bind a signatory to that agreement due to "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,

269 F.3d 187, 201 (3d Cir. 2001).

The equitable estoppel theory cannot be used to require Aetna to arbitrate. The claims asserted by Aetna are far afield from any contractual obligations between Aetna and Newman. *See id*. at 202 ("In sum, the thrust of the claims in the Amended Complaint are far enough removed from the Agreement such that DuPont should not be equitably estopped from repudiating the arbitration clause contained in the Agreement.").

## IV. CONCLUSION

Aetna does not have an agreement that mandates arbitration with the PCH Defendants for the allegations that Aetna has asserted. Thus, there is no basis to force Aetna to arbitrate here. An Order consistent with this Memorandum will be docketed separately.